FILED

2025 Aug-25  PM 12:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| TRACI JENEANE MCCARTHY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Case No.  5:24-cv-01259-HNJ |
| | ) |
| SOCIAL SECURITY | ) |
| ADMINISTRATION, | ) |
| COMMISSIONER, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Traci Jeneane McCarthy, proceeding *pro se*, seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") regarding her claim for a period of disability and disability insurance benefits.  (Doc. 1).  The undersigned carefully considered the record, and for the reasons expressed herein, the court **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate judge conduct any and all proceedings, including the entry of final judgment.  (Doc. 12).

"disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 1.00-114.02. *Id.* at § 404.1520(d). If a claimant's

impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience." (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 404.1520(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* § 404.1520(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education, and past work experience, that the claimant can perform other work. *Id.* § 404.1512(b)(3), 404.1520(g). If the claimant can perform other work, the evaluator

will not find the claimant disabled. *See id.* § 404.1520(a)(4)(v); *see also id.* § 404.1520(g). If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Indeed, "an ALJ's factual findings … 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g)). Although the court must "scrutinize the record as a whole … to determine if the decision reached is reasonable … and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence … is 'more than a mere scintilla,' … [and] means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (citations omitted). Therefore, substantial evidence exists even if the evidence

preponderates against the Commissioner's decision.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

McCarthy, age 41 at the time of the evidentiary hearing, filed an application for disability and disability insurance benefits on October 29, 2021, alleging disability as of June 14, 2021, due to BRCA-2, surgical breast implant complications, and resultant mental health issues.  (Tr. 199-200).  The Commissioner denied the application.  (Tr. 90-102).  McCarthy requested reconsideration, which the Commissioner also denied. (Tr. 104-113).  McCarthy timely filed a request for hearing before an administrative law judge on April 13, 2023.  (Tr. 127-128).  On September 25, 2023, the ALJ held a hearing. (Tr. 36-89).

The ALJ issued an unfavorable decision denying McCarthy's claim on January 10, 2024. (Tr. 9-26).  Applying the five-step sequential process, the ALJ found at step one that McCarthy had not engaged in substantial gainful activity since the alleged disability onset date.  (Tr. 11-12).  At step two, the ALJ determined McCarthy manifested the following severe impairments: disorder of the muscle, ligament, and fascia—double mastectomy resulting in no left breast; depressive/bipolar disorder; and generalized anxiety disorder.  (Tr. 12).

At step three, the ALJ concluded McCarthy did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments—specifically, listings 1.21 (soft tissue injury or abnormality under

continuing surgical management), 12.04 (depressive, bipolar, and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders)—in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12-16).

At step four, the ALJ found McCarthy exhibited the residual functional capacity ("RFC")

> to perform light work … except the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently[;] … stand and/or walk with normal breaks for 6 hours in an 8-hour workday and sit with normal breaks for 6 hours in an 8-hour workday[;] … frequently climb ramps and stairs but never climb ladders, ropes, and scaffolds[;] occasionally push/pull with the left upper extremity[;] never overhead reach with the left upper extremity but … occasionally reach in all other directions with the left upper extremity[;] … frequently stoop, kneel, crouch, and crawl[;] … tolerate occasional exposure to extreme cold, extreme heat, vibrations, wetness, and humidity[; never] … work at unprotected heights or around hazardous machinery[;] … understand, remember, and carry out simple and detailed instructions and tasks[;] … maintain attention and concentration for 2-hour periods sufficient to complete an 8-hour workday[;] … occasionally interact with co-workers, supervisors, and the general public[; and] … adapt to occasional workplace changes.

(Tr. 17).

To this end, the ALJ found McCarthy's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Tr. 18). Given the afore-cited RFC, the ALJ deemed McCarthy unable to perform past relevant work as a schoolteacher, substitute teacher, leasing agent, or grant coordinator since the alleged onset date. (Tr. 24-25).

Finally, taking McCarthy's age, education, work experience, and RFC into account at step five, the ALJ concluded McCarthy could perform a range of jobs that existed in significant numbers in the national economy, including inspector, tagger, and garment sorter. (Tr. 25-26). Therefore, the ALJ concluded McCarthy was not under a disability. (Tr. 26).

McCarthy filed a request for review of the hearing decision. (Tr. 195-196). On July 12, 2024, the Appeals Council denied McCarthy's request for review, which deems the ALJ's decision the Commissioner's final decision. (Tr. 1-3). McCarthy filed her Complaint in the present case on September 16, 2024. (Doc. 1).

## ANALYSIS

Because McCarthy proceeds pro se, the court construes her complaint liberally. *See Curtis v. Comm'r of Soc. Sec.*, 856 F. App'x 276 (11th Cir. 2021) (applying the liberal construction rule to a pro se Social Security appeal). McCarthy argues the ALJ's disability determination did not rest on substantial evidence. (Doc. 14 at 1). Specifically, she contends the ALJ failed to properly weigh "extensive evidence in the file" suggestive of disability, resulting in a residual functional capacity understating McCarthy's limitations. (*Id.* at 1-2 *see also id.* at 1 ("The ALJ found that my medical condition did not meet the criteria for disability under the Social Security Act, despite evidence of disfigurement, a previous diagnosis of Severe PTSD, multiple surgeries, limitations and impairments, along with an extensive treatment history.")). To this end, McCarthy attaches a series of medical records and photographs, some of which did not

appear in the record before the ALJ.  (*Id.* at 4-59).

Moreover, McCarthy claims the ALJ failed to give proper weight to her own testimony and the testimony of her treating physician, as "no objective medical evidence … contradict[ed her] recorded testimony."  (*Id.* at 2).  Relatedly, McCarthy claims the ALJ failed to apply the Treating Physician Rule to "the opinion of … Dr. Michael Yates."  (*Id.*).

For the reasons stated herein, the undersigned declines to reweigh the evidence in the record in McCarthy's favor.

To determine if a claimant can perform his past relevant work at step four or other work at step five, the ALJ must assess the claimant's RFC—the most a claimant can still do despite the physical and mental limitations resulting from her impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404. 1520(e);  *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004) (superseded by statute on other grounds as stated in *Portwood-Braun v. Commissioner of Social Security*, No. 22-11491, 2023 WL 2417856, at *1 (11th  Cir. Mar. 9, 2023)).  The ALJ must base her decision on all relevant evidence in the record, including medical history, medical signs and laboratory findings, the effect of treatment including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, and side effects of medication), daily activities, lay evidence, recorded observations, and medical source statements.  *See* SSR 96-8p, 1996 WL 374184, at *5 (1996); 20 C.F.R. § 404.1545(a)(3).

When claimants, as here, attempt to establish disability through their own testimony of pain or other subjective symptoms,

> [they] must satisfy two parts of a three-part test by showing: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

*Zuba-Ingram v. Comm'r of Soc. Sec.*, 600 F. App'x 650, 656 (11th Cir. 2015) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam)).  A claimant's testimony coupled with evidence that meets the pain standard "is itself sufficient to support a finding of disability."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citations omitted).  A claimant's subjective complaints alone stand insufficient to establish a disability. *See* 20 C.F.R. § 404.1529(a); *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991).

Social Security Ruling ("SSR") 16-3p, effective March 28, 2016, and republished October 25, 2017, eliminates the use of the term "credibility" as it relates to assessing the claimant's complaints of pain and clarifies that the ALJ "will consider any personal observations of the individual in terms of **how consistent** those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file."  SSR 16-3p, 2017 WL 5180304, *7 (Oct. 25, 2017).  An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location; duration, frequency, and

intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* C.F.R. § 404.1529(c)(3), (4).

SSR 16-3p also clarifies the ALJ's burden when discrediting a claimant's subjective symptoms:

> [I]t is not sufficient … to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough … simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

2017 WL 5180304 at *10; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

At the evidentiary hearing on September 25, 2023, McCarthy reported receiving a mastectomy and several subsequent breast-reconstruction surgeries because "[she] had the [BRCA] gene." (Tr. 56). During one such surgery, the skin adjacent to McCarthy's left nipple ruptured, and the surgeon applied sutures to repair the site. (Tr. 62). The rupture site reopened to expose McCarthy's implant. (*Id.*). The implant fell onto the floor during a clinic visit. (Tr. 64). McCarthy stayed in a hospital for several

days to allow physicians to clean the wound, administer antibiotics, and insert a new implant. (*Id.*).

Approximately two weeks later, McCarthy's left breast again reopened to expose the implant. (Tr. 64-65). McCarthy remained awake while medical professionals removed her implant. (Tr. 65). She then underwent another breast reconstruction procedure. (Tr. 65-66). McCarthy testified she received nine total surgeries. (Tr. 56).

 McCarthy recounted experiencing constant pain and intermittent numbness underneath her left breast and radiating down her left upper extremity. (Tr. 54). In addition, she stated her neck "bothers [her]," along with her left shoulder and back. (Tr. 55; 66).[2] To this end, McCarthy stated, "I … constantly daily have to make sure that I am elevating my arm right [and] … I am having to constantly care for myself in ways that I never thought." (Tr. 56). She rated her nipple pain as a "constant seven" out of ten, her neck pain as a six out of ten, her back pain as a nine out of ten, and her shoulder pain as a seven to seven-and-a-half out of ten. (Tr. 67-68).

After her more recent surgery, McCarthy reported she could not get out of bed due to soreness. (Tr. 56). She confirmed the exterior surgical wound appeared healed, but "the inner of the wound has not healed yet." (Tr. 58). McCarthy reported treating her pain with physical therapy, heating pads, baths, Nuerontin, and Gabapentin. (Tr.

---

[2] In addition, McCarthy described a tingling and burning sensation in her left leg due to a third-degree burn. (Tr. 71). She attributed some of the pain in her back to her leg injury, stating, "I was using most of my weight on my right [leg] and I don't know if it did something to my spine because … I couldn't even use my left leg …." (Tr. 72).

68).  Regarding her medication, McCarthy stated, "It helps, but [the pain] is still there and so I don't think it is helping."  (*Id.*).  McCarthy's treating physician recommended two additional surgeries pending adequate recovery.  (Tr. 58-60).

McCarthy described feeling isolated and reclusive due to her exposed breast implant and "underlying health issues."  (Tr. 55; *see also* tr. 80).  In addition, she described mentally reliving her latest breast implant removal procedure.  (*Id.*).  She denied receiving mental health treatment at the time of the evidentiary hearing, but she confirmed receiving such treatment in the past.  (Tr. 56-57).  In addition, she confirmed taking an over-the-counter antidepressant to control her anxiety.  (Tr. 57).

In a typical day, McCarthy reported "read[ing] a lot," walking "when [she] feel[s] that [she] need[s] to get up because the medicine … [makes her] feel a certain type of way," and preparing convenient meals.  (Tr. 73).  She reported sleeping on average five hours per night.  (*Id.*).  She described walking every thirty to forty minutes for ten- to thirty-minute  intervals.  (Tr. 74).  She reported standing for ten minutes before requiring rest and sitting with her left leg propped up for thirty to forty minutes before requiring movement.  (Tr. 74-75).

McCarthy reported driving approximately once a week to doctors' appointments (tr. 48) and working sporadically as a substitute teacher in the Madison City School System (tr. 49).  However, she declined accepting any recent positions due to frequent restroom use.  (Tr. 49).

She described problems reaching overhead with her left arm, although she reported "[she doesn't] really have much problem with the right arm." (Tr. 69). She reported an inability to reach forward with her left arm because she experiences "numbness in [her] hand" and "[has] dropped things in the past." (Tr. 69-70). She confirmed she could reach out to her side at shoulder level, "but it would cause [her] pain." (Tr. 70).

Regarding carrying heavy objects, McCarthy stated, "I won't be able to lift anything [with my left arm and hand] … not even a pound or a pencil because … sometimes I can't even feel my fingers." (Tr. 75). She confirmed she could carry a gallon of milk with her right hand. (*Id.*). McCarthy reported her roommate and daughter help her prepare meals, take care of personal needs, conduct housework, and shop. (Tr. 76-77). She stated she could dust and wipe countertops but could not engage in more strenuous activities such as vacuuming or folding laundry. (Tr. 77-78).

On February 8, 2023, McCarthy completed an Adult Function Report. (Tr. 292-303). She explained her conditions limit her ability to work due to intermittent, shooting pain and constant, dull pain in her breast area; compulsive thoughts and nightmares about her "breast opening up"; and medication-induced drowsiness. (Tr. 292). In her description of a typical day, McCarthy stated, "I wake up and eat to take my medicine and then I sit in the room all day until my daughter gets home and then I sit in the kitchen and watch while she cooks…." She denied talking to her roommate "to[o] often" because she "constantly feel[s] sad and out of [herself] because of fear

that [her] scar is opening." (Tr. 297). She described difficulty sleeping due to pain and racing thoughts. (*Id.*).

Regarding personal care, McCarthy stated her daughter helps her get in and out of the bath, care for her hair, shave her legs and armpits, and get off the toilet "at times." (Tr. 297). Relatedly, she remarked, "my overthinking about my breast make[s] me not care about my personal grooming." (Tr. 298). She denied preparing her own meals or engaging in house or yard work. (*Id.*). She reported going outside "only when [she goes] to doctor's appointments" and shopping remotely. (Tr. 299). She denied driving. (*Id.*). McCarthy confirmed she can count change, handle a savings account, and use a checkbook. (*Id.*). She listed her hobbies as reading and watching television but stated she "[has] a hard time focusing" on such activities. (Tr. 300). She denied participating in social activities or speaking to people outside the household.

McCarthy listed lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, completing tasks, concentrating, using hands, and getting along with others as activities affected by her conditions. (Tr. 301). She indicated she can lift five pounds, and she reported she can walk "a few feet" or "five minutes" before "pain returns." (*Id.*). She denied the ability to follow written or spoken instructions. (*Id.*). Finally, she reported experiencing nightmares about her breast implant falling out and "constantly checking [her] breasts to make sure [her implant] is still there." (Tr. 302).

Brandon Hopkins, a third party, completed Adult Function Reports on McCarthy's behalf on February 5, 2022, and February 6, 2022. (Tr. 254-265, 266-277). In the first report, Hopkins explained McCarthy's condition limits her ability to work due to restless sleep, nightmares, and fears concerning her breasts. (Tr. 254). Hopkins indicated McCarthy requires daily reminders about her personal care and "sits and stares out [the] window." (Tr. 255). He reported cooking on McCarthy's behalf and considered McCarthy incapable of completing household chores. (Tr. 256). Regarding McCarthy's ability to drive, Hopkins stated, "I encourage her to drive because I work and have no way to take her to doctor appointments." (Tr. 257). He confirmed McCarthy shops in stores to purchase medicine, but he indicated McCarthy cannot pay bills, count change, handle a savings account, or use a checkbook. (*Id.*). He reported McCarthy's depression and anxiety prevent her from engaging in hobbies or social activities. (Tr. 258).

Hopkins listed lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, remembering, completing tasks, concentrating, understanding, following instructions, using hands, and getting along with others as activities affected by McCarthy's conditions. (Tr. 259). To this end, he stated, "When Traci has a meltdown her whole body breaks down in tears. She will not safely be able to do any of the above activities because it is unknown when a meltdown will come." (*Id.*). He confirmed McCarthy can walk with pauses and pay attention for approximately two minutes. (*Id.*).

15

In the second report, Hopkins explained McCarthy's condition limits her ability to work due to daily pain, lack of sleep, nightmares, and fear of "being around people." (Tr. 266). Regarding McCarthy's daily routine, Hopkins explained, "Traci doesn't do anything throughout the day such as going outside, talking to people, [and] going to stores, and [she] constantly worries about her implant falling out and what others say about her." (Tr. 271). Regarding personal care, Hopkins indicated McCarthy's daughter assists her with dressing, bathing, caring for her hair, shaving, and getting on and off the toilet. (Tr. 271). He stated McCarthy's appetite has declined since the onset of her condition. (*Id.*). Hopkins confirmed he and McCarthy's daughter cook meals and perform housework on McCarthy's behalf "because she complains about pain and suffering." (Tr. 272-273). He reported McCarthy never goes outside due to social anxieties, never drives due to pain and inability to stay on task, and only shops for items remotely. (Tr. 273). He indicated McCarthy can count change, handle a savings account, and use a checkbook but cannot pay bills. (Tr. 274). Hopkins listed reading and watching television as McCarthy's occasional hobbies. (*Id.*).

Hopkins listed lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, completing tasks, concentrating, using hands, and getting along with others as activities affected by McCarthy's conditions. (Tr. 275). He reported McCarthy "can only lift about [five pounds] or less without complaining about pain." (*Id.*). He indicated McCarthy "stops often" when walking. (*Id.*). Finally,

Hopkins indicated McCarthy possesses a short attention span, a low stress tolerance, and drowsiness induced by medication. (Tr. 276).

According to a work history report dated February 5, 2022, McCarthy worked as a teacher in the Madison City School System in 2021. (Tr. 242-249). She estimated spending 9 hours walking; 9 hours standing; 9 hours handling large objects; and 9 hours writing, typing, or handling small objects. (Tr. 243). She lifted a maximum of 10 pounds and less than 10 pounds frequently. (*Id.*). McCarthy did not remember any previous jobs. (Tr. 244-249).

In determining whether a claimant is disabled under the aforementioned pain standard, an ALJ may consider evidence from before or after the relevant period between the alleged onset date of her disability and the date last insured, so long as the information bears on the claimant's disability during the relevant time. *Douglas v. Commissioner of Soc. Sec.,* 486 Fed. App'x 72, 75 (11th Cir. 2012) ("[The ALJ] properly applied this circuit's pain standard, taking into account evidence during the relevant period. He also considered evidence from before and after the relevant period that would have bearing on Douglas's disability during the relevant time."). To this end, the full medical record—including records pre-dating the alleged onset date and post-dating the date last insured—demonstrate McCarthy's symptoms stemming from her surgical history produced significant work-related limitations but did not result in complete disability.

17

On August 22, 2007, McCarthy received a digital bilateral diagnostic mammogram with Computer-Aided Detection analysis and a bilateral breast ultrasound. (Tr. 357). Both tests indicated a "heterogeneously dense parenchymal pattern," and "[n]o discrete mass … suggestive of malignancy [was] identified." (*Id.*).

From June 26, 2009, to February 19, 2010, McCarthy deferred prophylactic breast reconstruction to undergo a septoplasty/rhinoplasty procedure. (Tr. 354-356; 367).

On January 14, 2010, McCarthy presented to McMillion Medical Group to establish care. (Tr. 376). She reported a history of anxiety and post-traumatic stress disorder after involvement in a car accident. (*Id.*). McCarthy desired a referral to a psychologist. (*Id.*). She reported taking Lexapro for her symptoms. (Tr. 377). Dr. McMillion assessed paresthesia, anxiety disorder, and other malaise and fatigue. (*Id.*). He ordered bloodwork on McCarthy's behalf. (Tr. 378; *see also* tr. 411).

McCarthy returned to McMillion Medical Group on February 18, 2010. (Tr. 379). McCarthy reported Lexapro improved her anxiety symptoms, but she desired a dosage increase. (*Id.*). Dr. McMillion assessed insomnia, post-traumatic stress disorder, and generalized anxiety disorder. (Tr. 380). Upon examination, he recorded normal mood and affect; intact judgment; and normal orientation to time, place, and person. (*Id.*). He increased McCarthy's Lexapro dosage and also prescribed Ambien for daily use. (*Id.*).

On April 2, 2010, McCarthy visited the office of Dunigan, Yates and Alison (hereinafter "Dr. Yates") to discuss prophylactic breast reconstruction. The examiner informed McCarthy nipple reattachment "would not be considered [the] standard of care … because of potential for recurrent cancer underneath the nipple," but "[he] felt the risk for cancer would be quite small." (*Id.*). McCarthy indicated she understood the information presented and desired to proceed. (*Id.*).

McCarthy returned to McMillion Medical Group on April 8, 2010, for a recheck. (Tr. 381). Regarding insomnia, McCarthy reported "[s]till having some symptoms at [her] current dose." (*Id.*). In addition, she reported "continu[ing] to have flashbacks related to her accident." (*Id.*). Regarding psychiatric signs, Dr. McMillion recorded normal mood and affect; intact judgment; and normal orientation to time, place, and person. (*Id.*). He assessed insomnia, generalized anxiety disorder, and post-traumatic stress disorder. (*Id.*). He changed McCarthy's Lexapro prescription to Cymbaita and increased her Ambien dosage. (*Id.*).

McCarthy returned to McMillion Medical Group on April 13, 2010. (Tr. 383). She reported lingering insomnia "despite increasing [her] Ambien dose" and racing thoughts upon awakening at night. (Tr. 383). She described her symptoms as moderate and continuous. (*Id.*). Dr. McMillion explained McCarthy's new Cymbaita prescription "may take some time … to begin working." (*Id.*). Regarding psychiatric signs, he noted McCarthy exhibited normal mood and affect; intact judgment; and normal orientation

to time, place, and person.  (Tr. 384).  He changed McCarthy's Ambien prescription to trazadone.  (*Id.*).

On April 29, 2010, McCarthy visited Dr. Yates's office two months after her septoplasty/rhinoplasty procedure.    (Tr. 352).  Regarding prophylactic breast reconstruction surgery scheduled for June 7, 2010, Dr. Yates informed McCarthy "he [would] consult with Dr. Lancaster about the possibility [of nipple preservation]."  (*Id.*). In addition, Dr. Yates "discuss[ed] the anchor pattern that he [would use] for [McCarthy's] scars" and explained the risks associated with surgery.  (*Id.*).

On or about June 7, 2010, McCarthy underwent procedures for bilateral mastectomies due to a genetic predisposition for breast cancer (performed by Dr. Lancaster) and bilateral breast reconstruction with tissue expanders and FLEX-HD (performed by Dr. Yates).  (Tr. 363).  McCarthy reportedly "tolerated the … procedure well."  (Tr. 364).

On June 14, 2010, McCarthy visited Dr. Yates's office a week after the mastectomies and breast reconstruction with tissue expansion surgery.  (Tr. 352). McCarthy reportedly exhibited a "normal amount of swelling."  (*Id.*).  The examining medical professional noted McCarthy's drains remained in place and did not yet warrant removal.  (*Id.*).  He reminded her of her activity restrictions.  (*Id.*).

McCarthy returned to Dr. Yates's office on June 22, 2010.  (Tr. 352).  McCarthy's drains remained in place.  (*Id.*).  Dr. Yates observed McCarthy's breast mounds exhibited "good shape and symmetry" and noted no attendant healing problems.  (*Id.*).

McCarthy confirmed she would call the office in a week to report her drainage totals. (*Id.*).

On July 12, 2010, McCarthy retuned to Dr. Yates's office for drain removal. (Tr. 352). She received instructions pertaining to wound care and activity restrictions. (*Id.*).

On August 3, 2010, Dr. Yates remarked McCarthy's incisions "look[ed] very good," and he confirmed McCarthy could proceed with tissue expansion (Tr. 351). McCarthy received instruction on the use of Bactrim and Keflex. (*Id.*).

From August 10, 2010, to September 28, 2010, McCarthy underwent a series of tissue expansion procedures to a cumulative volume of 600 cubic centimeters bilaterally. (Tr. 351). Dr. Yates approved one to two additional expansions. (*Id.*).

On October 7, 2010, McCarthy presented to Dr. Yates's office "ready for second stage breast reconstruction." (Tr. 348). Dr. Yates recorded a supple and tender neck without masses; normal gait and motion; normal range of motion, stability, muscle strength, and tone; and no apparent misalignment, asymmetry, tenderness, or masses of the head and neck, spine, ribs, pelvis, or upper and lower extremities. (*Id.*). Regarding McCarthy's breasts, Dr. Yates stated, "The inframammary incisions are healing nicely. There is appropriate expansion. There is a nipple asymmetry that was present preoperatively with the right nipple being significantly higher than the left. No masses are noted." (*Id.*).

Dr. Yates explained McCarthy's upcoming operation, which would entail "re-open[ing] the inframammary incision, remov[ing] the expanders, and plac[ing] [silicone

gel] implants." (*Id.*)  He approved an additional tissue expansion to 650 cubic centimeters bilaterally.  (Tr. 350).  He informed McCarthy of the risks associated with the procedure, including "bleeding[;] need to return to the operating room for a bleeding problem[;] infection, including the possibility that if the implants become infected that they might need to be removed, left out, later replaced, or simply left out[;] adverse scarring[;] hypertrophic or keloid scarring[;] widened noticeable scars[;] poor healing[;] wound breakdown[;] failure to achieve the desired degree of improvement[;] dissatisfaction with the results of the surgery or the degree of improvement or the final shape or appearance of the breasts[;] … stroke, death, or other adverse response [to anesthesia;] … asymmetry with the nipple/areola heights being different[;] and other risks as well."  (Tr. 349).  In addition, Dr. Yates listed the risks associated with the implants themselves, including "leakage, capsular contracture …, wrinkling or distinct visibility or palpability of the implants, interference with mammograms including delaying the diagnosis of breast cancer, [and] the fact that some people maintain that breast implants cause health problems in the body."  McCarthy expressed her understanding of the risks and desired to proceed.  (*Id.*).

On October 5, 2010, McCarthy returned to Dr. Yates's office for an additional tissue expansion.  (Tr. 350).  The examining medical professional did not proceed with the tissue expansion because McCarthy "[was] beginning to develop an asymmetry with the nipple height with the right nipple higher than the left," and her skin appeared tight.

(*Id.*). The examiner informed McCarthy "[he] would rather have Dr. Yates examine this area before any[ ]more expansions." (*Id.*).

On December 2, 2010, McCarthy returned to Dr. Yates's office "to rediscuss her upcoming surgery on Dec[ember] 6 for removal of tissue expanders and placement of silicone implants." (Tr. 347). McCarthy expressed concerns about silicone implants leaking without her knowledge. In addition, she recalled her sister signed a mandatory waiver before receiving silicone breast implants. Dr. Yates "reassured [McCarthy] that she would not be required to sign a waiver," as the implants "[were] approved by the FDA for reconstruction and for cosmetic purposes [without] limitations except regarding age for very young girls." (*Id.*). Moreover, Dr. Yates informed McCarthy "[s]cientific studies have shown silicone implants don't cause any health problems"; "[regular] MRI[]s are not required" following surgery; "[McCarthy] might not be aware that she had a leak, but this in general would cause her no problems"; and "[i]mplants don't have to be replaced unless there is a problem noted." (*Id.*). Dr. Yates also cautioned McCarthy that "saline implants would be hard feeling on her chest" and appear wrinkled. (*Id.*). Dr. Yates provided McCarthy with pre-operation instructions. (*Id.*).

On December 6, 2010, McCarthy underwent an operation for "[r]emoval of bilateral tissue expanders and placement of bilateral silicone gel breast implants." (Tr. 359).

On December 10, 2010, McCarthy presented to Dr. Yates's office. (Tr. 349). The examining medical professional noted no healing problems associated with the implants. (*Id.*). He recorded "good" symmetry, although "the right nipple [appeared] a little higher than the left" as noted prior to surgery. (*Id.*). He instructed McCarthy to limit her activities. (*Id.*).

McCarthy returned to Dr. Yates's office on December 23, 2010. (Tr. 347). McCarthy expressed satisfaction with the results of the surgery. (*Id.*). In addition, she reported "bilateral nipple sensation." (*Id.*). The examining practitioner instructed McCarthy to wear a soft bra, sports bra, or camisole. (*Id.*). He permitted McCarthy to increase her activities to walking or riding a stationary bike but cautioned her against jogging, aerobics, or weightlifting for an additional month. (*Id.*).

On March 24, 2011, McCarthy presented to Dr. Yates's office for a recheck. (Tr. 347). The examining practitioner observed "a little rippling" in the implants due to McCarthy's slender figure. (*Id.*). Otherwise, McCarthy appeared "[to be] doing very well and healing nicely." (*Id.*). Dr. Yates stated McCarthy may wish to replace her silicone implants with form-stable implants when they became available in the United States. (*Id.*).

McCarthy visited McMillion Medical Group on April 1, 2011, to "complain[] of a several month history of worsening anxiety." (Tr. 385). McCarthy reportedly stopped taking her anxiety medication a few months previously and developed mild to moderate symptoms thereafter. (*Id.*). She requested "go[ing] back to Lexapro if possible" due to

cost considerations. (*Id.*). Regarding psychiatric signs, the examiner recorded normal mood and affect; intact judgment; and orientation to time, place, and person. (Tr. 386). He assessed insomnia and generalized anxiety disorder. (*Id.*). He ordered McCarthy to "[b]egin SSRI for treatment" and "[b]ridge with Xanax." (*Id.*).

McCarthy returned to McMillion Medical Group on June 1, 2011, for a medication recheck. (Tr. 387). Regarding psychiatric signs, the examiner recorded normal mood and affect; intact judgment; and orientation to time, place, and person. (Tr. 388). He assessed posttraumatic stress disorder and generalized anxiety disorder, and he instructed McCarthy to "[c]ontinue [her] current treatment." (*Id.*).

On February 27, 2012, McCarthy presented at McMillion Medical Group for a medication recheck. (Tr. 389). The examining practitioner reported McCarthy stopped "taking Zoloft and only has anxiety about twice a month." In addition, he noted McCarthy "[d]oes well with Xanax on an occasional basis" and "[a]lso [does] well with Ambien." (*Id.*). Regarding psychiatric signs, the examiner reported normal mood and affect; intact judgment; and orientation to time, place, and person. (*Id.*). He instructed McCarthy to "use Xanax sparingly for occasional anxiety," "[c]ontinue Ambien as needed," and "[a]void daily use." (*Id.*).

On July 12, 2012, McCarthy presented to Dr. Yates's office. (Tr. 345). She expressed satisfaction with the volume of her breasts, although "fairly significant nipple asymmetry that was present to some extent preoperatively" remained and the silicone implants appeared palpable. (*Id.*). The examiner stated the palpability of the implants

likely stemmed from McCarthy's thin build, resulting in a relative absence of "tissue to cover the implants." (*Id.*). Accordingly, the examiner opined "the best choice would be to wait for [form-]stable implants … due to come out sometime within the next few months." (*Id.*). Such implants "[would] likely … [appear] somewhat firmer and hold their shape better." (*Id.*). McCarthy agreed to contact the office in approximately three months to inquire about the availability of form-stable implants. (*Id.*).

On July 19, 2012, McCarthy informed Dr. Yates the size of her implants aggravated her back and caused her daily pain "even though … she did request a large size." (Tr. 345). Dr. Yates confirmed McCarthy's back pain could relate to her implant size and discussed the possibility of using a smaller size when form-stable implants became available. (*Id.*). McCarthy confirmed taking one half of a Percocet every one to two days to treat her back pain. (*Id.*). She agreed she would return for a consultation when the form-stable implants became available. (*Id.*).

On August 16, 2012, McCarthy called Dr. Yates's office to request a prescription to treat her pain. (Tr. 346). Dr. Yates approved a 60-dose prescription of "pain pill[s]" with no refill. (*Id.*).

On August 21, 2012, McCarthy informed Dr. Yates's staff the previously prescribed pain medication made her nauseated. (Tr. 346). Dr. Yates approved a new 60-dose prescription for Percocet. (*Id.*).

On October 16, 2012, Dr. Yates referred McCarthy to a pain specialist because she "continued to ask for pain medicine without making any decision regarding removal

and replacement" of her implants. (Tr. 346). McCarthy received a final Percocet prescription to manage her pain until establishing care with a specialist. (*Id.*). McCarthy expressed interest in removing and replacing her implants and scheduled an appointment to consult with Dr. Yates. (*Id.*).

McCarthy again presented to Dr. Yates's office on or about October 25, 2012. (Tr. 343).[3] She complained her implants felt large and heavy such that they produced neck and back pain. (*Id.*). Accordingly, McCarthy requested smaller breast implants. (*Id.*). Upon examination, Dr. Yates recorded a supple and tender neck without masses; normal gait and motion; normal range of motion, stability, muscle strength, and tone; and no apparent misalignment, asymmetry, tenderness, or masses of the head and neck, spine, ribs, pelvis, or upper and lower extremities. (Tr. 344). Regarding McCarthy's breasts, Dr. Yates stated, "Relatively good shape to the breasts but the nipple/areola areas are positioned laterally and the right nipple/areola area is higher compared to the left. Significant wrinkling and visibility of the implants." (*Id.*). He advised McCarthy of the risks of removing her current implants and replacing them with smaller implants. (*Id.*). McCarthy stated she understood the risks and desired to proceed. (*Id.*).

On January 23, 2013, McCarthy presented to McMillion Medical Group to request a refill of Ambien. (Tr. 391). She reported occasional anxiety controlled with Xanax. (*Id.*). Regarding psychiatric signs, Dr. McMillion reported normal mood and

---

[3] Alternative records dated February 7, 2013, and June 13, 2013, contain identical information. (Tr. 338-339; 341-342).

affect; intact judgment; and orientation to time, place, and person. (Tr. 392). He assessed insomnia, generalized anxiety disorder, and post-traumatic stress disorder. (*Id.*). He prescribed Ambien. (Tr. 393).

On April 5, 2013, Dr. McMillion reported normal mood and affect; intact judgment; and orientation to time, place, and person. (Tr. 397).

McCarthy visited Dr. Yates's office on July 25, 2013, complaining of "significant wrinkling" of her breasts along with neck and back problems associated with heavy silicone implants. (Tr. 466). Dr. Yates reported, "[McCarthy] … had difficulty with pain to the extent that we referred her to Tennessee Valley Pain Consultants for evaluation because of continued need for narcotics." (*Id.*). Upon examination, Dr. Yates recorded normal gait and motion; normal range of motion, stability, muscle strength and tone; and no apparent misalignment, asymmetry, tenderness, or masses of head and neck, spine, ribs, pelvis, or upper and lower extremities. (Tr. 467). Regarding McCarthy's breasts, Dr. Yates stated, "Relatively good shape to the breasts but the nipple/areola areas are positioned laterally and the right nipple/areola is higher compared to the left. Significant wrinkling and visibility of the implants. No masses are noted." (*Id.*). He recommended removal of McCarthy's implants, elevation of the inframammary creases, and placement of form-stable implants. (Tr. 467). He informed McCarthy of the risks associated with the procedure. (*Id.*). McCarthy expressed her understanding of the risks and desired to proceed. (*Id.*).

On August 5, 2013, McCarthy underwent a procedure to remove her bilateral silicone gel implants and replace them with form-stable highly cohesive gel implants. (Tr. 361; *see also* tr. 337; tr. 468). According to an operative report, "[i]t was recognized that it would not be possible to correct the nipple areolar asymmetry or to significantly alter the placement of the nipple areolar complexes on the breast mounds, and this had been discussed extensively with the patient." (Tr. 472). A surgical pathology report dated August 5, 2013, indicates the left and right breast capsules contained benign fibroadipose tissue with focal synovial metaplasia consistent with breast implant capsules and no carcinoma. (Tr. 370).

McCarthy returned to Dr. Yates's office for follow-up on August 12, 2013. (Tr. 340). The examining practitioner instructed McCarthy to call the office within three days to report her drainage outputs. (*Id.*). In addition, he instructed McCarthy to maintain all restrictions and refrain from removing her tape dressings. (*Id.*).

McCarthy called Dr. Yates's office on August 15, 2023, to report drainage totals of less than 20 cubic centimeters for two days. (Tr. 340). A practitioner removed McCarthy's drains and dressed the sites with gauze. (*Id.*).

On August 20, 2013, McCarthy presented at Dr. Yates's office for follow-up. (Tr. 340). The examining practitioner noted McCarthy's scars appeared "nicely positioned." (*Id.*). McCarthy reportedly stopped taking Bactroban and Keflex because an ulcer developed in her mouth. (*Id.*). In addition, she stated Ibuprofen "[was] not working for her." (*Id.*). Accordingly, she requested a refill of pain medication and

received a prescription for "Percocet 5/325 mg 1 p.o. q.4.h. p.r.n. pain #40 with no refills." (*Id.*). In addition, McCarthy received a prescription for fade cream to apply to her scars. (*Id.*). Dr. Yates instructed McCarthy to wear an underwire bra and return for a recheck in two weeks. (*Id.*).

On September 17, 2013, McCarthy presented to Dr. Yates's office for a recheck. (Tr. 337). McCarthy's breasts appeared "somewhat wrinkled," which Dr. Yates attributed to McCarthy's thin build and an absence of flesh covering her implants. (*Id.*). Dr. Yates stated McCarthy might desire additional fat injections in the future but instructed McCarthy to wait two to three months to assess her healing progress. (*Id.*). Dr. Yates prescribed McCarthy a fade cream to apply to her scars. (*Id.*). In addition, he advised McCarthy to wear an underwire bra in the daytime and engage in "whatever other activities are comfortable for her." (*Id.*).

On October 9, 2013, McCarthy visited McMillion Medical Group for an emergency room follow-up after suffering an allergic reaction to ant bites. (Tr. 399). McCarthy reportedly "[had] some mild pain and swelling of her arm but otherwise had no problems." (*Id.*). However, McCarthy reported becoming worried her house was infested with ants. (*Id.*). She reported trouble sleeping and expressed interest in seeing a psychiatrist. (*Id.*). Regarding psychiatric signs, Dr. McMillion reported normal mood and affect; intact judgment; and orientation to time, place, and person. (Tr. 400). He provided McCarthy a list of psychiatrists and instructed her to continue Ambien and Xanax as needed. (*Id.*).

30

On November 7, 2013, Dr. McMillion reported normal mood and affect; intact judgment; and orientation to time, place, and person. (Tr. 403).

On December 3, 2013, McCarthy returned to Dr. Yates's office. (Tr. 337). She expressed interest in receiving fat injections, but "Dr. Yates informed her that [Blue Cross Blue Shield] insurance will not cover fat injections." (*Id.*). Dr. Yates observed McCarthy's nipples appeared in a better position and her current implants "fit her body" with "less wrinkling." (*Id.*).

On December 12, 2013, McCarthy visited McMillion Medical Group to complain of worsening anxiety and depression. (Tr. 405). McCarthy explained she recently lost her job and her apartment. (*Id.*). She described trouble sleeping and claimed "Ambien [was]n't really helping." In addition, McCarthy reportedly "did not tolerate Zoloft or Lexapro" and requested Ativan. (*Id.*). Regarding psychiatric signs, Dr. McMillion recorded normal mood and affect; intact judgment; and orientation to time, place, and person. (Tr. 406). He prescribed Effexor and Ativan and instructed McCarthy to "try to get in with a psychologist." (*Id.*).

On March 11, 2014, McCarthy presented to McMillion Medical Group "to discuss issues with anxiety and possible disability." (Tr. 408). Specifically, she reported a "[s]everal year history of moderate non-resolving lower back pain." (*Id.*). McCarthy described the pain as "dull and achy and sharp at times," intermittent, and worsened by movement. (*Id.*). McCarthy reportedly consulted with a neurosurgeon who did not recommend surgical intervention "years ago." (*Id.*). McCarthy received care from a

pain management specialist. (*Id.*). Dr. McMillion instructed McCarthy to contact her pain management doctor to discuss her symptoms and "get back in touch with her neurosurgeon for further evaluation." (Tr. 409).

On June 3, 2014, Dr. McMillion informed McCarthy he would no longer treat her chronic anxiety, as "[he felt] that [McCarthy] would be better served with the care from a mental health professional, namely a psychiatrist." (Tr. 503). He prescribed McCarthy a 30-day supply of Xanax with three refills. (*Id.*). Dr. McMillion again provided McCarthy with a list of psychiatrists. (*Id.*).

On December 16, 2016, McCarthy visited the Emergency Department at Huntsville Hospital after involvement in a car accident. (Tr. 474). McCarthy complained of pain in the neck, left shoulder, and back. (Tr. 477). She confirmed her pain worsened with movement and improved with rest. (Tr. 477-478). She rated her pain as a five out of ten. (*Id.*). X-rays of the thoracic spine and chest and a CT scan of McCarthy's neck returned negative findings of acute injury. (Tr. 479). The examining physician prescribed Motrin and Flexeril. (Tr. 480).

On or about March 15, 2021, McCarthy presented to the office of Dr. David Durst "for consideration of revision of her breast reconstruction." (Tr. 493). McCarthy reported "irregularity of both breasts and some soreness out laterally on the left breast." (*Id.*). The examining physician observed "a lateral contracture on the left resulting in some fairly significant deformity" and ordered an MRI of McCarthy's breast to detect "any evidence for leak." (Tr. 492). In addition, he planned to accumulate McCarthy's

previous treatment records. (*Id.*). He explained "the most logical approach" to breast reconstruction would entail "implant exchange" and "several sessions" of "subsequent fat grafting." (*Id.*). Moreover, he explained "[l]ateral capsulectomy could be accomplished on the left to address the tightness in that region." (*Id.*).

On March 19, 2021, McCarthy presented to the Huntsville and Madison Hospital Breast Center at Huntsville Hospital to complain of sharp pain in the left breast area. (Tr. 455; 572). McCarthy underwent a complete bilateral breast ultrasound, which indicated "[n]o suspicious sonographic abnormality in either breast," unremarkable "[v]isualized portions of the implants," and "[n]o pericapsular fluid collections." (Tr. 456; 573).

McCarthy returned to Dr. Durst's office on April 5, 2021. (Tr. 492). The ultrasound obtained at McCarthy's previous visit did not suggest an implant leak. (*Id.*). Given McCarthy's concerns regarding Breast Implant-Associated Anaplastic Large Cell Lymphoma (BIA-ALCL), Dr. Durst articulated a plan to "remove [McCarthy's current] implants, replace them with smooth implants[,] and do some fat grafting." (*Id.*). He explained he would not engage in fat grafting in the inferior area, as he planned to conduct "a partial anterior capsulectomy sparing the inframammary crease shelf." (*Id.*). McCarthy agreed to proceed pending approval from her insurance company. (*Id.*).

On June 7, 2021, McCarthy visited Dr. Durst's office for a preoperative appointment. (Tr. 424; 490; 578; 580). Dr. Durst explained the details of the procedure and the risks associated with it, including bleeding, hematoma formation, infection,

hypertrophic changes of the incision and scar, asymmetries, and capsular contracture. (Tr. 424; 490; 579; 581). In addition, he discussed implant displacement exercises. (*Id.*). McCarthy appeared in good health with an unremarkable physical exam. (*Id.*). She reportedly "[did] not take any medicines." (*Id.*).

On June 9, 2021, Dr. Durst's office contacted McCarthy to advise her of elevated coagulation levels. (Tr. 490). Staff instructed McCarthy to discontinue CBD oil, herbal tea, and all herbal supplements prior to her surgery scheduled for June 14, 2021. (Tr. 490).

On June 14, 2021, McCarthy underwent a procedure, performed by Dr. Durst, for removal of her existing breast implants, insertion of smooth round breast implants, insertion of adipose tissue grafted from the abdomen, and capsulectomy. (Tr. 433). According to operative notes,

> [B]oth implants were intact and well positioned within their pockets. Both capsules looked completely normal. An anterior capsulectomy on the right was accomplished that weighed 17 g and anterior capsulectomy on the left which weighed 23 g was accomplished. There was very dense scarring between the capsule and the lateral skin flap at the 3 o'clock position on the left. This resulted in a buttonhole that had to be resected. This was reinforced with a lateral pectoral flap sewn to the skin flap itself.

(Tr. 444; 494; 598). A surgical pathology report indicated McCarthy's breast capsules returned negative results for malignancy. (Tr. 496; 604; 606).

McCarthy visited Dr. Durst's office on June 15, 2021. (Tr. 491). McCarthy ambulated "up and around" and exhibited minimal soreness and nausea. (*Id.*). A practitioner removed McCarthy's bandages. (*Id.*). The examining physician observed

McCarthy's incisions appeared "fine." (*Id.*). In addition, he stated, "The excision of the [buttonhole] area looks like it is viable at this point[,] so I think it is going to be OK." (*Id.*).

McCarthy returned to Dr. Durst's office on June 21, 2021. (Tr. 491). She reported "still having some soreness left more than right." (*Id.*). The examining physician observed McCarthy's "inferior poles look significantly improved by switching to the smooth implant," as "there [was] no more wrinkling or distortion" and "the fat grafting in the upper breast looks to be very smooth and nice." (*Id.*). However, he also observed a "worrisome" buttonhole area on McCarthy's left lateral side where "the skin [was] not perfectly healed yet." (*Id.*). Dr. Durst instructed McCarthy to "[c]ontinue Polysporin on that [site] aggressively." (*Id.*). In addition, he instructed McCarthy to begin weaning herself off pain medicine. (*Id.*).

McCarthy visited Dr. Durst's office on June 29, 2021. (Doc. 489). McCarthy reportedly developed itching associated with her incisions. (*Id.*). A practitioner removed McCarthy's sutures from her inframammary incisions. (*Id.*). Dr. Durst prescribed Silvadene twice daily to address a dry eschar on the left breast. (*Id.*). To this end, he stated, "I am worried about [the eschar] because of the coverage of the implant in that region. We[']re going to be very conservative with the treatment of that." (*Id.*).

On July 2, 2021, McCarthy called Dr. Durst's office to report "itching to the nipples" interfering with her ability to sleep. (Tr. 489). McCarthy received a prescription for Vistaril with no refills. (*Id.*).

On July 13, 2021, Dr. Durst observed McCarthy "still [had] the dry eschar lateral to the nipple areolar complex on the left." (Tr. 489). Accordingly, he recommended McCarthy continue Silvadene twice daily. (*Id.*). In addition, Dr. Durst observed "the right implant [was] moving excellently," while the left "[was] moving okay but not fantastically." (*Id.*). He instructed McCarthy "to be aggressive about her side to side exercises." (*Id.*).

On August 11, 2021, McCarthy called Dr. Durst's office to cancel a previously scheduled appointment and report some concerning drainage at her incision site. (Tr. 489).

On August 16, 2021, Dr. Durst observed a centimeter-and-a-half wound and an "obviously exposed" implant on McCarthy's left breast. (Tr. 488). Dr. Durst devised the following treatment plan:

> I have indicated to her that I think that we will lose this implant. I am not willing to try and close this over the site and do IV antibiotics certain it will ultimately fail with severe contracture. As a result I have recommended to her that we [excise] that site and close it at the same time as removing her implant through an inframammary incision…. [W]e will get an ID consult as soon as we get the final culture results. At that point if they feel that the patient can be treated with p.o. antibiotics fine. I will plan on restarting her reconstruction on the left in 6 months. We have discussed the potential risks of this would include worsening of an infection and development of severe scarring. Obviously it is going to be [an unsatisfactory] appearance until we do get the reconstruction resumed. I do not plan to do a full capsulectomy to him [sic.] when we do the surgery[.] I think I will [do] a limited capsulectomy at most.

(Tr. 488). Dr. Durst scheduled surgery for implant removal and subtotal capsulectomy with subsequent ID consult for the following day. (*Id.*).

On or about August 17, 2021, McCarthy called the office of Dr. Durst to cancel surgery, as she sustained exposure to COVID-19. (*Id.*). On or about August 19, 2021, McCarthy received a prescription for a 10-day dosage of Levaquin due to bacterial growth on a culture taken at Dr. Durst's office. (Tr. 486-487).

On August 29, 2021, McCarthy presented to the Huntsville Hospital Emergency Department to complain of an exposed breast implant that "[had] progressively gotten worse" and "opened up more in the past couple of days." (Tr. 460; 609). Upon examination, the physician observed "a circular area around 4 x 5 cm just to the left superior aspect of [the] left areola" featuring an exposed implant. (Tr. 461; 610). He detected "no surrounding pain, redness, or drainage," although he noted McCarthy's "left breast [appeared] somewhat larger than the right." (*Id.*). He observed the "implant bag seem[ed] to be intact with no obvious leaking of fluid from it." (*Id.*). The physician otherwise recorded normal orientation and affect, appropriate responses, no neck tenderness, no cervical spinal or paraspinal tenderness, no thoracic tenderness, no lumbar tenderness, no abdominal tenderness, and no swelling or tenderness in the extremities. (Tr. 460-461; 609-610). He discharged McCarthy with instructions for outpatient follow-up because he detected "no secondary signs of infection" and the implant did not appear to contain a leak. (*Id.*).

On September 1, 2021, McCarthy presented to the University of Alabama at Birmingham for evaluation of an exposed implant. (Tr. 518; 524). While a practitioner photographed the site, McCarthy's implant "fell out completely." (*Id.*). The examining

physician recommended hospital admission, IV antibiotics, surgical debridement, irrigation of the breast pocket, and Veraflo VAC dressing. (*Id.*). Next, he recommended returning McCarthy to the operating room "to explore the wound and evaluate if it is ready for a new implant." (*Id.*). Moreover, he advised McCarthy that a smaller implant size would reduce the danger of recurrent exposure. (*Id.*). He reviewed the risks of McCarthy's treatment plan, including scar location, recurrent seroma, hematoma, wound healing problems, breast asymmetry, need for additional surgery, infection, need for expansion and complete reconstruction, and routine operative risks. (*Id.*). McCarthy voiced her understanding and desired to proceed. (*Id.*). Upon examination, the examiner assessed no back, neck, joint, or muscle pain; no decreased range of motion; and no anxiety, depression, mania, delusions, hallucinations, or suicidal ideations. (Tr. 520; 526). In addition, he recorded normal strength, no tenderness, no swelling, and oriented speech and cognition. (*Id.*).

On September 2, 2021, McCarthy underwent a procedure, performed by Dr. De La Torre, at UAB for "[e]xcisional debridement of [McCarthy's breast] capsule" due to a contaminated open left breast implant pocket. (Tr. 413; 504; *see also* tr. 508; 538). McCarthy reportedly "tolerated the procedure well." (Tr. 414; 505; 541). Subsequently, McCarthy remained at the hospital on inpatient status for "Veraflo vac therapy." (Tr. 507).

On September 7, 2021, McCarthy underwent another procedure at UAB, performed by Dr. De La Torre, for removal of her current breast implants and

placement of new implants. (Tr. 506; *see also* tr. 508-509; 538-539). Specifically, the surgeon "placed a 450 mL silicone gel filled smooth round Mentor high profile implant on the right side and a 300 mL silicone gel filled Mentor smooth round moderate plus profile implant on the left side." (Tr. 542). McCarthy reportedly "tolerated the procedure well." (Tr. 543). McCarthy "stayed one additional night for antibiotics" (tr. 507; 537) and received discharge on September 8, 2021, with prescriptions for clindamycin, Percocet, docusate-senna, and ibuprofen. (Tr. 506; 507; 536; 537).

On September 22, 2021, McCarthy presented to UAB Hospital for a postoperative evaluation. (Tr. 510; 531). The examining physician observed McCarthy's incisions appeared "well healed on the right," although the upper outer and lower inner quadrants exhibited "some swelling and impending blistering." (*Id.*). An ultrasound revealed "oval fluid collection measuring 89 x 27 x 30 mm" in the interior left breast "consistent with a seroma" but "not suspicious for infection." (Tr. 513-514; 534-535). The examiner prescribed clindamycin due to McCarthy's "suspicious skin changes." (Tr. 510; 531).

McCarthy returned to UAB Hospital on October 8, 2021, with another exposed left breast implant. (Tr. 515; 528). McCarthy consented to the removal of the implant. (*Id.*). She received local anesthesia alongside the planned incision. (*Id.*). Medical practitioners subsequently removed the implant completely, irrigated the pocket with Betadine, and placed dressing on the procedure site. (Tr. 516; 529). Staff informed

39

McCarthy they would contact her regarding further surgery for implant and latissimus flap placement.  (Tr. 515; 528).

On November 10, 2021, McCarthy contacted UAB Hospital to cancel a previously scheduled surgery.  (Tr. 548).  "No reason was given."  (*Id.*).[4]

McCarthy presented to Dr. Yates's office on March 22, 2022, with "obvious deformity of the left breast … for consideration for further reconstruction."  (Tr. 670).  Dr. Yates summarized the following conversation:

> I talked with the patient about further breast reconstruction.  I indicated that I felt we might be able to redo her breast reconstruction on the left with a tissue expander and with use of ADM.  I explained that this would involve reopening the incision on the undersurface of the breast, recreating the pocket underneath the tissues as well as the muscles in the chest area, likely using ADM to try to reinforce the thinned area of the breast, and placement of a tissue expander.  I explained that ADM is acellular dermal matrix and this is a skin product harvested from donors and that the skin is processed to remove the donor cells and to be made sterile.  I indicated this can help provide thickness for the patient's own tissue, and if it works properly, it is incorporated into the patient's tissues and becomes a permanent layer that can help support or reinforce the pocket with regard to the expander and subsequent placement of the implant.  I noted that the expander would be partially inflated to begin with and then we would expand gradually to recreate the breast mound on the left side.  I noted that we would try to provide expansion that would give her appropriate size.  She feels that the right breast implant is small, and I would tend to agree with her.  Dr. De La Torre's OP note indicates this is a 450 cc implant, but that would seem to be a bit unusual as the left implant was only 300 cc.  However, a larger implant would likely benefit her body.  I noted to her that I did not know whether we would be able to achieve a larger breast size for her given the difficulty she has had.  I noted that after expansion is completed, a second operation would be

---

[4] At the evidentiary hearing, McCarthy stated, "My insurance stopped on November 1 of that year, … so I didn't have insurance to cover that operation, is the reason, but the notes … did not reflect that." (Tr. 43).

> performed to remove the expander and place the implant which would be
> a silicone gel breast implant, and that we might be able to remove and
> replace the right implant at the same time.

(Tr. 671-672).   Dr. Yates reviewed the risks of the recommended procedure with McCarthy.  (Tr. 672).  McCarthy expressed her understanding and wished to consider the information.  (*Id.*).[5]  Dr. Yates otherwise recorded a supple and nontender neck with no masses; a soft and nontender abdomen with no masses; normal gait and motion; normal range of motion, stability, muscle strength and tone; and no apparent misalignment, asymmetry, tenderness, or masses of the head and neck, spine, ribs, pelvis, or upper and lower extremities.  (Tr. 671).

On April 27, 2022, Dr. Donald W. Blanton, Ph.D., conducted a consultive examination and report.  (Tr. 557).  McCarthy reported she could not repair her left breast because she possessed "thin skin" and had undergone seven previous surgeries. (*Id.*).  McCarthy averred her "nervous trouble and depression" began after a breast surgery in June of 2021.  (*Id.*).  She reported difficulty sleeping and recurrent dreams about "[having] her breast."  (*Id.*).  She previously worked as a model and a teacher but no longer engaged in such occupations because she "[felt] mutilated."  (*Id.*).  McCarthy confirmed taking antidepressant medications in the past.  (*Id.*).  She denied seeking admission to a mental hospital or receiving other mental health treatment.  (*Id.*).  She possessed a family history of mental illness but no addiction.  (*Id.*).

---

[5] An alternative record dated June 13, 2022, contains identical information.  (Tr. 338-339; 341-342).

During the examination, McCarthy engaged in logical conversation, exhibited intact associations, and presented flat but appropriate affect. (Tr. 557). Dr. Blanton detected no signs of confusion, suicidal ideation, homicidal ideation, or psychomotor retardation. (Tr. 557-558). He observed McCarthy appeared "visibly restless" with a depressed mood. (Tr. 558). McCarthy confirmed daily bouts of crying, poor sleep, poor appetite, and weight loss. (Tr. 558). She presented no evidence of hallucinations, delusions, or paranoia, "but she [reported] frequent bad dreams about her missing breast" and "obsess[ed] on her breast problems." (*Id.*). Dr. Blanton affirmed McCarthy appeared alert and oriented to time, place, and person. (*Id.*). She could name the president of the United States, perform calculations, and interpret proverbs. (Tr. 558). Dr. Blanton estimated McCarthy possessed "near average" intelligence with adequate short- and long-term memory. (*Id.*). He attributed McCarthy's poor counting performance to her anxiety at the time of the examination. (*Id.*). Dr. Blanton characterized McCarthy's insight as poor and judgment "adequate for work and financial type decisions." (*Id.*).

McCarthy denied engaging in household chores, although "[s]he was vague about where [sic.] she no longer does these chores." (*Id.*). McCarthy reportedly drove, shopped, and handled money. She denied socializing outside the home and reported "think[ing] all day every day about her breast problem." (*Id.*). Given the information gathered, Dr. Blanton assessed moderate anxiety and depression due to failed surgery and provisional obsessive-compulsive disorder. (*Id.*).

On May 28, 2022, Adrianne Crane, N.P., conducted a consultive examination and report. (Tr. 562). McCarthy reported "increased depression, hopelessness, … negative self-image," stress, and nightmares associated with "the trauma she sustained with her breast issues." (*Id.*). McCarthy denied receiving a professional mental health evaluation or taking prescribed medications for her trauma. (*Id.*). The examiner determined McCarthy could drive, conduct housework, tend to her personal needs, and cook independently, "although she does not feel like cooking most of the time." (Tr. 563). Regarding shopping and handling finances, McCarthy reported receiving assistance from a male friend. (*Id.*). McCarthy appeared alert and oriented to time, place, and person. (*Id.*). She appeared cooperative and issued appropriate responses. (*Id.*). Ms. Crane determined McCarthy could pinch, grasp, and manipulate objects and sit, stand, and walk with no limitations. (Tr. 564; 567). In addition, McCarthy exhibited normal range of motion in the cervical spine, lumbar spine, bilateral shoulders, bilateral elbows, bilateral wrists, and bilateral hands. (Tr. 565-567). She determined McCarthy could lift and carry approximately 15 pounds bilaterally with frequent periods of rest, although "bending and lifting … exacerbate[ed McCarthy's] back and left chest pain." (Tr. 567).

On June 20, 2022, McCarthy underwent a procedure for breast reconstruction with tissue expander and antibiotic beads. (Tr. 631; 638). According to surgical notes, Dr. Yates encountered "significant scar tissue." (Tr. 639). In addition, he determined "the use of ADM [would] not provide any significant additional benefit." (*Id.*).

McCarthy reportedly "tolerated the procedure well." (*Id.*). She received prescriptions for chlorpheniramine, ciprofloxacin, clindamycin, and oxycodone-acetaminophen prior to discharge on June 21, 2022. (Tr. 629-630).

On June 27, 2022, McCarthy presented to Dr. Yates's office for a postoperative appointment. (Tr. 673). The examining practitioner remarked McCarthy "look[ed] great," excepting a rash or breakout on "the left axilla above the JP drain insertion site." (*Id.*). McCarthy attributed the rash to antibiotic ointment. (*Id.*). Accordingly, the medical examiner instructed McCarthy to refrain from putting ointment on the area and "treat the skin area with hydrocortisone cream if it is itching." (*Id.*). The examiner noted plans to fill the tissue expansion site from 400 cubic centimeters to 550 cubic centimeters. (*Id.*).

McCarthy returned to Dr. Yates's office on July 5, 2022. (Tr. 673). Dr. Yates declined to remove McCarthy's drain as too much drainage remained. (*Id.*). The examining practitioner observed McCarthy's incision appeared to "[heal] without difficulty." (*Id.*). McCarthy received a prescription for Bactroban antibiotic ointment to apply to the drain site. (*Id.*).

On July 28, 2022, a practitioner removed McCarthy's drain and advised her to continue cleaning the site with peroxide and applying antibiotic ointment. (Tr. 673). The examiner observed a "significant crease in [McCarthy's] left breast," which Dr. Yates expected to "improve with expansions and an implant." (*Id.*).

44

McCarthy presented to Dr. Yates's office on August 18, 2022, for a recheck. (Tr. 673). She reported "no problems." (*Id.*). Upon examination, Dr. Yates detected no "reaccumulation of fluid to [McCarthy's] left breast." (*Id.*). Accordingly, Dr. Yates believed McCarthy "eligible to continue with her expansion." (*Id.*).

From August 22, 2022 to September 12, 2022, McCarthy received a series of tissue expansions to a cumulative volume of 550 cubic centimeters. (Tr. 674). On September 15, 2022, Dr. Yates declined to authorize an additional 50 cubic centimeters of expansion. (*Id.*).

McCarthy visited Dr. Yates's office on September 26, 2022, "ready for her next operation for removal of the tissue expander, placement of prosthesis, and revision of a retracted scar of the left breast." (Tr. 675). The examining physician recorded a supple and tender neck without masses; normal gait and motion; normal range of motion, stability, muscle strength, and tone; and no apparent misalignment, asymmetry, tenderness, or masses of the head and neck, spine, ribs, pelvis, or upper and lower extremities. (Tr. 676). Regarding McCarthy's breasts, the examining physician stated, "There is a reasonable shape to the breasts, but there is a significant indented scar related to her prior wound breakdowns and infections as followed per other plastic surgeons." (*Id.*). He explained McCarthy's upcoming procure would entail "reopening her incision, removing the expander, placing an implant, and trying to revise the scar of

the left breast" and discussed the risks associated with the procedure. (*Id.*). McCarthy voiced her understanding and desired to proceed. (*Id.*).[6]

On October 31, 2022, McCarthy underwent a procedure for removal of the left tissue expander, removal of the right breast implant, bilateral insertion of breast implants, bilateral insertion of antibiotic beads, capsulectomy of the left lower breast pocket for adjustment of the pocket, and capsulectomy of the left upper lateral breast for release of scar. (Tr. 654; 660). According to operative notes, McCarthy "examined [her breasts in a] sitting position," stated "there was a nice overall improvement," and "recognized … there [were] still significant asymmetries and … significant persistent scar contracture of the left breast adjacent to the nipple where [she] had very significant healing problems related to her procedures by other plastic surgeons." (Tr. 661; 679). McCarthy reportedly "tolerated the procedure well." (*Id.*).

McCarthy returned to Dr. Yates's office on November 8, 2022, for a postoperative visit. (Tr. 677). The examiner reported McCarthy "[was] doing very well" and removed her padding at the lower incision of the inframammary crease due to a lack of drainage. (*Id.*).

On November 17, 2022, Dr. Yates permitted McCarthy to engage in light exercise but no heavy lifting. (Tr. 677). McCarthy reportedly expressed satisfaction with her results. (*Id.*).

---

[6] An alternative record dated October 25, 2022, contains identical information, except an added handwritten notation reads, "Also will remove & replace R implants." (Tr. 644-647).

On January 12, 2023, McCarthy received prescriptions for Tramadol and Celebrex. (Tr. 677).

McCarthy returned to Dr. Yates's office on January 19, 2023, complaining of "shooting pains to her nipples, more so on the left lateral breast than the right." (Tr. 677). Dr. Yates wrote McCarthy a prescription for Neurontin. (*Id*.). He informed McCarthy that "[l]ater down the line fat grafting [could] be done for the indentions to her breast tissue." (*Id*.).

On January 27, 2023, McCarthy contacted Dr. Yates's office to report "breakthrough pain more on the left than on the right" despite taking Celebrex and Neurontin. (Tr. 677). McCarthy received a Tramadol prescription. (*Id*.).

On February 27, 2023, Brenda James, M.Ed., LPC-S, conducted a psychological consultive examination and report. (Tr. 684-687). McCarthy "stated that she performs ADLs independently," including managing finances. (Tr. 685). However, she reported an inability to cook, clean, wash dishes, launder clothes, and shop "due to lack of energy and problems with her arm." (*Id*.). McCarthy reported reading, watching television, and talking to her daughter and her roommate in her spare time. (*Id*.). She denied attending social events. (*Id*.).

McCarthy denied receiving inpatient psychiatric treatment, although she confirmed receiving outpatient mental healthcare through her primary care physician in the past. (Tr. 686). During the examination, she appeared alert and oriented with a cooperative demeanor. Ms. James described McCarthy's speech as "unremarkable with

a rambling stream of thought." (*Id.*).  McCarthy described her current mood as "awful" and rated her depression as a 10 out of 10.

McCarthy failed to perform serial 7 subtractions from 100, serial 4 additions from 1, and single-digit multiplication problems. (*Id.*).  In addition, McCarthy could not give details of contemporaneous news items. (*Id.*).  However, she could identify the existing President, three large cities, and similarities between certain words. (Tr. 686-687).  She indicated 52 weeks comprised a year, and she recited four digits forward and two digits in reverse. (Tr. 687).  She could not recall recent meals or the age at which she left school, but she could provide dates of previous employment. (*Id.*).

Ms. James indicated "McCarthy's level of intellectual functioning appeared to be in the average range" with "fair insight into her current situation," although "Ms. McCarthy appeared to exhibit minimal effort on the Sensorium." (*Id.*).  Accordingly, Ms. James deemed McCarthy "mild to moderately impaired in her ability to understand, remember, and carry out instructions and to respond appropriately to supervision, co-workers, and work pressures in a work setting." (*Id.*).

McCarthy returned to Dr. Yates's office on February 16, 2023, for a recheck. (Tr. 682).  Dr. Yates "state[d] he [was] very well pleased with what he was able to do, although fat grafting is a consideration to the divot." (*Id.*).  However, he feared McCarthy might acquire another infection. (*Id.*).  McCarthy reported pain in her left breast area radiating to her left arm. (*Id.*).  In addition, she described "a sensation of [her arm] being asleep or numb and tingly." (*Id.*).  She confirmed Tramadol and

Neurontin helped manage her pain but did not alleviate "sharp shooting pains." (*Id.*). McCarthy stated she could not see a pain specialist due to cost. (*Id.*). She received a prescription for Tramadol. (*Id.*).

A photograph dated March 11, 2023, depicts McCarthy's left breast. (Tr. 37).

On June 19, 2023, Dr. Yates provided McCarthy with a referral to a pain specialist. (Tr. 694). According to the letter, McCarthy "seem[ed] to be healing" from her most recent procedure "reasonably well … without infection" but reported "significant neuropathic pain related to her multiple healing issues." (*Id.*).

On September 13, 2023, McCarthy visited Candace Blackwood, FNP-BC, supervised by Dr. Seljuki, to complain of left breast pain and seek disability assessment. (Tr. 698-700). In a section of the treatment notes labelled "Activities of Daily Living," McCarthy confirmed she could care for herself. (Tr. 699). Upon examination, the physician recorded a supple neck, normal tone and motor strength, normal movement of all extremities, and normal gait. (Tr. 700). She confirmed she would refer McCarthy for disability assessment. (*Id.*).

On September 18, 2023, McCarthy presented to The Orthopedic Center with left shoulder pain, left arm pain, and numbness. (Tr. 702). McCarthy reportedly experienced pain conducting activities of daily living, namely "lifting things, doing overhead activities," and maintaining stability. (*Id.*). She rated her pain as a seven out of ten at worst, a zero out of ten at lowest, and a six out of ten at that time (accompanied by numbness). (*Id.*).

In association with the visit McCarthy completed an Upper Extremity Functional Index in which she marked "Extreme Difficulty or Unable to Perform Activity" or "Quite a Bit of Difficulty" for every category. (Tr. 706). The assessing physical therapist reported decreased strength, decreased range of movement, and pain limiting functional mobility. (Tr. 703). He recorded the following strength and range of motion totals:

- Shoulder passive range of motion
    - Flexion: 155
    - Abduction 158
    - ER [external rotation]: 72
    - IR [internal rotation]: 58
- Shoulder active range of motion
    - Flexion: 95
    - Abduction: 105
    - ER: ear
    - IR: glute
- Shoulder strength
    - Flexion: 3+
    - Abduction: 3+
    - ER: 4-
    - IR: 4-.

Accordingly, the physical therapist determined "[s]killed PT [was] necessary to return to [prior level of function].". (*Id*.). The record does not indicate whether McCarthy attended any subsequent physical therapy sessions.

The foregoing records—considered as a whole—provide substantial evidence to support the ALJ's RFC determination, and the ALJ properly cited objective medical evidence refuting the severity of McCarthy's alleged physical and mental symptoms. (*See* tr. 18 ("As for the claimant's statements about the intensity, persistence, and

limiting effects of her symptoms, they are inconsistent because the medical evidence does not support the claimant's allegations of severe and chronic limitation of function to the degree that it would preclude performance of all substantial gainful activity.")).

Regarding McCarthy's reported breast, neck, shoulder, and back pain, the ALJ recorded McCarthy's extensive surgical history dating back to 2010. (Tr. 18-19). In particular, the ALJ discussed McCarthy's initial mastectomies and immediate bilateral breast reconstruction with tissue expanders in June 2010 (tr. 364); removal of bilateral tissue expanders and placement of bilateral silicone gel breast implants in December 2010 (tr. 359); removal of bilateral silicone gel implants and placement of bilateral form-stable highly cohesive gel implants in August 2013 (tr. 361); removal of bilateral textured breast implants and insertion of bilateral smooth breast implants in June 2021 (tr. 433); irrigation and debridement of the left breast pocket with implant replacement in September 2021 (tr. 413); left implant removal and latissimus reconstruction in October 2021 (tr. 515); left breast reconstruction with tissue expander and antibiotic beads in June 2022 (tr. 361); and removal of the left tissue expander, removal of the right breast implant, bilateral insertion of breast implants, capsulectomy of the left lower breast pocket, and capsulectomy of the left upper lateral breast for release of scar in October 2022 (tr. 654). That said, the ALJ also observed physical examination notes reflected largely unremarkable results throughout the relevant period. (Tr. 20). Indeed, Dr. Yates recorded a supple and tender neck without masses; normal gait and motion; normal range of motion, stability, muscle strength, and tone; and no apparent misalignment,

asymmetry, tenderness, or masses of the head and neck, spine, ribs, pelvis, or upper and lower extremities on October 7, 2010; October 25, 2012; March 22, 2022; September 26, 2022; and September 13, 2023. (Tr. 343, 348, 671, 675, 700).

Moreover, the ALJ endorsed some of McCarthy's more recent complaints of pain, weakness, and limited mobility. (Tr. 20). On February 16, 2023, McCarthy reported pain in her left breast area radiating to her left arm and "a sensation of [her arm] being asleep or numb and tingly." (Tr. 682). McCarthy confirmed Celebrex and Neurontin helped alleviate her pain to an extent, and the examining physician prescribed Tramadol. (*Id.*). According to a referral letter to a pain specialist dated June 19, 2023, Dr. Yates stated McCarthy "seem[ed] to be healing" from her most recent procedure "reasonably well … without infection" but nevertheless reported "significant neuropathic pain related to her multiple healing issues." (Tr. 694). On September 13, 2023, McCarthy complained of left breast pain, but she also confirmed she could perform activities of daily living independently. (Tr. 699). Upon examination, the physician recorded a supple neck, normal tone and motor strength, normal movement of all extremities, and normal gait. (Tr. 700). Finally, on September 18, 2023, McCarthy presented to a physical therapy office for a pain evaluation. (Tr. 702). McCarthy reported difficulty "lifting things, doing overhead activities," and maintaining stability. (*Id.*). She rated her pain as a seven out of ten at worst, a zero out of ten at lowest, and a six out of ten at that time. (*Id.*). The examining physical therapist assessed decreased strength, decreased range of movement, and pain limiting functional mobility. (Tr.

703).  He prescribed a course of skilled physical therapy sessions, but the record does not indicate whether McCarthy attended such sessions.  (Tr. 705).

Acknowledging the foregoing complaints, the ALJ accounted for McCarthy's limitations in the RFC assessment by determining she "[could] only perform work-related activities at the light exertional level" with several attendant exertional and non-exertional limitations.  (Tr. 20 ("More recent evidence suggested some pain, weakness, and limited mobility, but these findings would not necessarily preclude the performance of all work-related activities, and the undersigned has accounted for these findings in the residual functional capacity.")).

Furthermore, the court identifies inconsistencies regarding McCarthy's self-reported symptoms of pain.  For example, at the evidentiary hearing on September 25, 2023, McCarthy reported experiencing constant pain.  (*See, e.g.,* tr. 54).  However, at a physical therapy pain evaluation on September 18, 2023, McCarthy rated her pain as a zero out of ten at lowest, suggesting an absence of pain at times.  (Tr. 702).  Moreover, McCarthy testified pain medications alleviated her symptoms to an extent.  (*See, e.g.,* tr. 68, 682).

The court also identifies inconsistencies regarding McCarthy's activities of daily living.  For instance, on May 28, 2022, Adrianne Crane, N.P., determined McCarthy could drive, conduct housework, launder clothes, bathe, dress, and prepare meals.  (Tr. 563).  On September 13, 2023, McCarthy indicated she could care for herself.  (Tr. 699).  However, at the September 25, 2023, evidentiary hearing, McCarthy stated, "the most

I can do is … wipe down the counter tops or wipe down the stove using my right hand." (Tr. 77). Moreover, in an Adult Function Report dated February 8, 2023, McCarthy denied preparing her own meals, performing housework, or tending to her personal care independently. (Tr. 297-298). Relatedly, third-party Adult Function Reports dated February 5 and 6, 2022, indicate McCarthy's daughter and roommate performed household chores on her behalf. (Tr. 256, 272-273). Thus, the record does not stand entirely consistent regarding the claimant's subjective complaints of pain or her alleged degree of limitation.

Regarding McCarthy's allegedly debilitating anxiety and depression, the ALJ observed McCarthy's mental health treatment records appeared sporadic and remote to the timeframe of alleged disability. (Tr. 21-22). *See Douglas,* 486 Fed. App'x at 75 (noting an ALJ may consider evidence predating the relevant period so long as the information bears on the claimant's disability during the relevant time). Indeed, although McCarthy submitted evidence of anxiety and depression symptoms dating back to 2010, such records predate McCarthy's disability application by more than seven years and bear minimal relevance to her current symptoms. (Tr. 376-391 (noting anxiety symptoms relating to car accident, ants)). Moreover, McCarthy denied any psychiatric hospitalizations (tr. 557) and testified an over-the-counter antidepressant helped alleviate her current symptoms (tr. 57). Indeed, according to more recent medical records from Dr. Yates's office dated March 22, 2022, and September 26, 2022,

McCarthy appeared alert and oriented with memory and mood within normal limits. (Tr. 67, 676).

Two psychological consultive examinations support moderate mental limitations as reflected in the ALJ's RFC assessment. On April 27, 2022, Dr. Donald W. Blanton, Ph.D., observed McCarthy appeared "visibly restless" with a depressed mood. (Tr. 558). He indicated McCarthy "obsess[ed] on her breast problems." (*Id.*). He characterized McCarthy's insight as poor. (*Id.*). That said, Dr. Blanton also detected no signs of confusion, suicidal ideation, homicidal ideation, psychomotor retardation, hallucinations, delusions, or paranoia. (Tr. 557-558). Dr. Blanton affirmed McCarthy appeared alert and oriented to time, place, and person. (Tr. 558). She could name the existing president of the United States, perform calculations, and interpret proverbs. (*Id.*). Dr. Blanton estimated McCarthy possessed "near average" intelligence with adequate short- and long-term memory. (*Id.*). He attributed McCarthy's poor counting performance to her anxiety at the time of examination. (*Id.*). Dr. Blanton characterized McCarthy's judgment "adequate for work and financial type decisions." (*Id.*).

On February 27, 2023, Brenda James, M.Ed., LPC-S, administered a psychological examination. (Tr. 686). McCarthy described her current mood as "awful" and rated her depression as a 10 out of 10. (*Id.*). She failed to perform serial 7 subtractions from 100, serial 4 additions from 1, and single-digit multiplication problems. (*Id.*). In addition, McCarthy could not give details of contemporaneous news items, recall recent meals, or provide the date on which she left school. (*Id.*). That said,

McCarthy could identify the existing President, three large cities, and similarities between certain words. (Tr. 686-687). She indicated 52 weeks comprised a year, recited four digits forward and two digits in reverse, and provided the dates of her previous employment. (Tr. 687). As the ALJ noted, McCarthy's inconsistent answers "support[ed] Ms. James's assertion that the claimant provided minimal effort" on the Sensorium portion of the examination. (Tr. 23).

Considered as a whole, Dr. Blanton and Ms. James's observations suggest McCarthy exhibited some limitations in mental functioning, but such limitations did not rise to debilitating levels. Thus, substantial evidence supports the ALJ's assessment of McCarthy's mental limitations in the RFC determination.

McCarthy appears to assert the ALJ selectively evaluated the medical record and failed to consider evidence consistent with her own allegations. (Doc. 14 at 1 ("The ALJ erred to give weight to my claim for disability, regardless of the extensive evidence in the file….")). *See Robinson v. Colvin*, No. 5:12-cv-1954-AKK, 2014 WL 2214294203, at *5 (N.D. Ala. May 28, 2014) ("[I]t was unreasonable for the ALJ to rely only on the small snapshot of treatment notes that showed improvement immediately after [claimant's] back surgery, and to ignore the later notes outlining the return of [claimant's] pain.").

As an initial matter, the ALJ need not explicitly discuss every potentially relevant medical record. *See Brito v. Comm'r, Soc. Sec. Admin.,* 687 F. App'x 801, 804 (11th Cir. 2017) ("Although [claimant] points to other evidence in the record that was consistent

with her hearing testimony and to which the ALJ did not specifically refer in making her credibility determination, the ALJ was not required to examine or reference every piece of evidence, so long as it is evident, as it is here, that the ALJ considered [her] medical condition as a whole.").

Even so, the ALJ did not cherry-pick the records to support her own conclusion. First, the ALJ did not improperly disregard evidence buttressing McCarthy testimony. As discussed at length previously, she noted several instances in which McCarthy complained of adverse symptoms and documented McCarthy's extensive history of surgical management.

Second, the ALJ assessed a residual functional capacity including significant limitations. As such, the ALJ determined McCarthy could not perform past relevant work as a schoolteacher, substitute teacher, leasing agent, or grant coordinator. (Tr. 24-25). Moreover, although the ALJ determined McCarthy could perform light work, such labor included the following limitations: lifting 20 pounds occasionally and 10 pounds frequently; standing and/or walking with normal breaks for 6 hours in an 8-hour workday; sitting with normal breaks for 6 hours in an 8-hour workday; frequently climbing ramps and stairs but never climbing ladders, ropes, and scaffolds; occasionally pushing/pulling with the left upper extremity; never reaching overhead with the left upper extremity but occasionally reaching in all other directions with the left upper extremity; frequently stooping, kneeling, crouch, and crawling; tolerating occasional exposure to extreme cold, extreme heat, vibrations, wetness, and humidity; never

57

working at unprotected heights or around hazardous machinery; understanding, remembering, and carrying out simple and detailed instructions and tasks; maintaining attention and concentration for 2-hour periods sufficient to complete an 8-hour workday; occasionally interacting with co-workers, supervisors, and the general public; and adapting to occasional workplace changes. (Tr. 17). Thus, substantial evidence in the record supports the ALJ's RFC determination based upon McCarthy's impairments.

McCarthy submits additional exhibits with her brief to support a finding of disability, including a pain referral letter from her treating physician (doc. 14 at 4), medical records indicating McCarthy suffered a burn to her left lower extremity of "unspecified degree" (doc. 14 at 5), a prescription for Lamotrigine (doc. 14 at 6-11), undated photographs (doc. 14 at 12-21), and medical records from McMillion Medical Group (tr. 22-59). Some of those documents do not appear in the administrative record. (Doc. 14 at 5-21).

> According to sentence six of section 405(g),
>
> > The court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding....

42 U.S.C. § 405(g); *see also Ingram v. Commissioner of Soc. Sec.*, 496 F.3d 1253, 1267 (11th Cir. 2007) ("Sentence six of section 405(g) provides the sole means for a district court to remand to the Commissioner to consider new evidence presented for the first time in the district court[.]"); *Caulder v. Bowen*, 791 F.2d 872, 876 (11th Cir. 1986) (holding

district court could not consider newly presented evidence for the purposes of a sentence four remand because "a reviewing court is limited to the certified administrative record in examining the evidence," yet the court "should remand a case to the Secretary to consider such evidence if a claimant makes a sufficient showing" under sentence six). Under the Eleventh Circuit's three-part test to effect a sentence-six remand for consideration of new evidence, the claimant must show "(1) there is new, noncumulative evidence; (2) the evidence is 'material,' that is, relevant and probative so that there is a reasonable possibility that it would change the administrative result, and (3) there is good cause for the failure to submit the evidence at the administrative level." *Caulder*, 791 F.2d 877 (citing *Cherry v. Heckler*, 760 F.2d 1186 (11th Cir. 1985) (superseded by statute on other grounds as stated in *Kimbril v. Soc. Sec. Admin.*, No. 22-11992, 2023 WL 3487764, at *1 (11th Cir. May 17, 2023)).

McCarthy does not discharge her burden on this issue. As an initial matter, she fails to indicate the "new" records submitted with her brief stood unavailable or unattainable at the administrative level. *See Arnold v. Comm'r of Soc. Sec.*, 724 F. App'x 772, 781-82 (11th Cir. 2018) ("The good cause requirement is satisfied when the evidence did not exist at the time of the administrative proceedings. If, however, the claimant could have obtained the evidence sooner, good cause is not shown.") (internal citations omitted).

More importantly, McCarthy fails to portray how such records would alter the ALJ's analysis and produce a different outcome. First, Dr. Yates's pain referral letter

and Dr. McMillion's treatment records appeared in the record for the ALJ's consideration. (Doc. 14 at 4, 22-58; tr. 376-412, 694). Second, medical records indicating McCarthy sustained a burn on her leg offer little additional information, as McCarthy testified about the burn at the evidentiary hearing and the ALJ took McCarthy's testimony into consideration. (Doc. 14 at 5; tr. 71). Moreover, the medical record contains evidence confirming McCarthy's burn history. (*See, e.g.,* tr. 433, 489, 511, 519, 525, 532, 548, 588, 610, 632, 655, 685). Third, the prescription for Lamotrigine and accompanying notes provide no information about McCarthy's specific symptoms or side-effects, only general side-effects. (Doc. 14 at 6-11). Finally, the submitted photographs appear undated and thus offer little probative value regarding McCarthy's objective medical signs or symptoms of pain. (Doc. 14 at 12-21).

In sum, McCarthy does not successfully undermine the substantial evidence supporting the ALJ's RFC assessment. Although McCarthy maintains her symptoms limit her to a greater degree than the ALJ assessed, the court cannot reweigh the evidence or second-guess the ALJ's conclusions. *See Winschel,* 631 F.3d at 1178 (citations and internal quotation marks omitted). Thus, substantial evidence supports the ALJ's assessment of McCarthy's subjective complaints, and McCarthy's contrary interpretation of the evidence does not warrant reversal.

The ALJ also properly evaluated the medical source opinions of Adrianne Crane, N.P.; Dr. Victoria Hogan, M.D.; Dr. Robert Haas, M.D.; Dr. Gloria Roque, Ph.D.; Brenda James, M.Ed. LPC-S; and Dr. Kristen Berthiaume, Ph.D.

As discussed previously, Adrianne Crane, N.P., conducted a consultive examination and report on May 28, 2022. (Tr. 562). Ms. Crane determined McCarthy could pinch, grasp, and manipulate objects, and sit, stand, and walk with no limitations. (Tr. 564; 567). In addition, she determined McCarthy could lift and carry approximately 15 pounds bilaterally with frequent periods of rest, although "bending and lifting … exacerbate[ed McCarthy's] back and left chest pain." (*Id.*).

The ALJ considered Crane's opinion "generally persuasive" because she conducted a thorough physical examination and "accounted for some degree of limitation given [McCarthy's] reported pain and possibility of exacerbating her reported symptoms." (Tr. 21). Furthermore, the ALJ acknowledged "the record as a whole supports additional functional limitations, but Ms. Crane did not have access to all the evidence available at the hearing level." (*Id.*).

On June 7, 2022, Dr. Victoria Hogan, M.D., opined McCarthy could perform all work-related activities within a limited range of medium exertion. (Tr. 99). In particular, she found McCarthy could occasionally lift or carry 50 pounds; frequently carry 25 pounds; stand or walk for six hours in an 8-hour workday with normal breaks; sit for 6 hours in an 8-hour workday with normal breaks, frequently climb ramps and stairs but never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; avoid concentrated exposure to extreme temperatures and vibration; and avoid all exposure to hazardous machinery and unprotected heights. (Tr. 97-98).

The ALJ found Dr. Hogan's opinion unpersuasive because the record supported "a greater degree of limitation." (Tr. 21). More specifically, Dr. Hogan failed to consider McCarthy's "breast-related issues" and surgical history resulting in significant scarring, range-of-motion restrictions, and stiffness. (*Id.*).

On February 23, 2023, Dr. Robert Haas, M.D., opined McCarthy "should reasonably be able to work at the Not Severe level" within 12 months after bilateral breast reconstruction on October 31, 2022. (Tr. 107).

The ALJ found Dr. Haas's opinion unpersuasive because McCarthy's "longstanding breast-related issues … dated back to 2010" and "create[d] more than minimal work-related limitations resulting in a severe impairment." (Tr. 21).

In an opinion issued on April 28, 2022, Dr. Gloria Roque, Ph.D., determined McCarthy could "understand, remember and carry out short, simple instructions and tasks"; "maintain attention and concentration for 2 hours with all customary rest breaks" in a "well[-]spaced work environment … with a few familiar co-workers"; "avoid hazards"; and "travel, make plans, and set goals independently." (*Id.*). In addition, she opined McCarthy should "avoid excessive workloads, quick decision making, rapid changes and multiple demands"; experience "infrequent and non-intensive" contact with the public; receive "tactful, constructive and non-threatening" supervision; undergo "infrequent and gradually introduced" workplace changes; and receive "assistance with any detailed or long[-]range goal setting." (Tr. 100). Finally,

she opined McCarthy "would … likely … miss 1-2 days a month due to psychologically based symptoms." (*Id.*).

The ALJ considered Dr. Roque's opinion only partially persuasive because it employed "vague, unclear, and/or undefined" language—such as "non-intensive," "tactful," "constructive," and "non-threatening"—"offer[ing] little probative value in assessing the claimant's mental residual functional capacity." (Tr. 23-24).[7]

Also discussed previously, Brenda James, M.Ed., LPC-S, conducted a psychological consultive examination and report on February 27, 2023. (Tr. 684-687). Ms. James indicated "McCarthy's level of intellectual functioning appeared to be in the average range" with "fair insight into her . . . situation," although "Ms. McCarthy appeared to exhibit minimal effort on the Sensorium." (*Id.*). Accordingly, she deemed McCarthy "mild to moderately impaired in her ability to understand, remember, and carry out instructions and to respond appropriately to supervision, co-workers, and work pressures in a work setting." (*Id.*).

The ALJ found Ms. James's opinion partially persuasive "to the extent that it was generally consistent with and supported by the medical evidence of record, including Ms. James's own examination report." (Tr. 24). However, the ALJ noted the record

---

[7] The ALJ determined the April 27, 2022, opinion rendered by Dr. Donald Blanton, Ph.D., "did not provide a functional opinion for the undersigned to consider," as he did not opine whether McCarthy could still perform certain activities despite the mental limitations resulting from her impairments. (Tr. 24).

better supported a moderate rather than "mild to moderate" limitation in all relevant areas of mental functioning. (*Id.*).

In an opinion issued on March 21, 2023, Dr. Kristen Berthiaume, Ph.D., "essentially adopted the opinion of Dr. Roque at the initial level." (Tr. 24; 111). Accordingly, the ALJ found the opinion only partially persuasive for "similar reasons set forth" previously vis-à-vis the assessment of Dr. Roque's evaluation. (Tr. 24).

The ALJ considered the experts' opinions persuasive only insofar as they appeared consistent with the medical evidence of record. (Tr. 20-24). Thus, the ALJ accounted for the experts' opinions in her RFC assessment to the extent they accorded with her own conclusions vis-à-vis McCarthy's limitations. The opinions thus constitute substantial evidence supporting the ALJ's RFC determination.

McCarthy argues the ALJ failed to apply the "Treating Physician Rule" to credit the testimony of Dr. Yates. (*See* Doc. 14 at 2 ("The ALJ's finding that my subjective complaints were not credible was not supported by substantial evidence, as the ALJ did not give proper weight to my testimony and the testimony of my doctor…. The ALJ did not give proper weight to the opinion of my treating physician, Dr. Michael Yates, who documented my complex medical history.")). As an initial matter, Dr. Yates did not issue a medical source opinion, as he never opined what McCarthy could still do

despite her impairments.[8]  Moreover, even if Dr. Yates did issue such an opinion, under the regulatory framework applicable to McCarthy's claim,[9] the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."  20 C.F.R. § 404.1520c(a).  Finally, the ALJ thoroughly considered treatment records from Dr. Yates's office in her RFC assessment.  (Tr. 18-20).

---

[8] "A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: . . .

> (i)      Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

> (ii)      Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

> (iii)      Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

> (iv)      Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 416.913(a)(2) (2017).

[9] On January 18, 2017, the Commissioner revised the regulations governing the assessment of medical opinion evidence for claims filed on or after March 27, 2017.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5867 (Jan. 18, 2017) (codified at 20 C.F.R. § 404.1520c).

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision.

The court will enter a separate final judgment.

**DONE** this 25th day of August, 2025.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE